**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03556-PAB-STV

ALON BARAK;
KR8TIV, LLC; and
KR8TIV GROUP, LLC,

Plaintiffs,

v.

ROOSTER'S GUIDE & OUTFITTING ADVENTURES;
RODNEY COGBURN; and
AVA COGBURN,

Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

Magistrate Judge Scott T. Varholak

This matter comes before the Court on Defendants' Combined Motion to Dismiss and Motion for Default and Default Judgment (the "Motion"). [#281] The Motion has been referred to this Court. [#282] This Court has carefully considered the Motion and related briefing, the entire case file and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Court respectfully **RECOMMENDS** that the Motion be **GRANTED** in part and **DENIED** in part as detailed herein.

## I. FACTUAL BACKGROUND[1]

This action arises out of a joint venture entered into by Plaintiffs and Defendant Rooster's Guide & Outfitting Adventures ("Rooster"). [#99 at ¶ 18] Plaintiffs entered the joint venture with Defendant Rooster on or around July 15, 2019. [*Id.*] The purpose of the joint venture was to plant, cultivate, and harvest industrial hemp into hemp biomass and smokeable flower for sale. [*Id.* at ¶ 26] Plaintiffs intended to fund the expenses of the joint venture up to an agreed amount, and Defendants would furnish the land, provide labor and expertise, and engage in the cultivation, harvesting, and storage of the hemp. [*Id.* at ¶ 28] According to the Complaint, Defendants stated that Plaintiffs would make ten million dollars on their investment. [*Id.* at ¶ 30] Defendants also told friends and relatives that Plaintiff Barak was an "angel investor" who was simply providing Defendants with money to grow and market industrial hemp. [*Id.* at ¶ 75]

At the time the joint venture was entered into, Plaintiffs believed that the plot of land on which the joint venture was to take place consisted of real property on which three homes existed and a 1,500 square foot barn had been constructed. [*Id.* at ¶ 20] Plaintiffs believed that Defendant Ava Cogburn ("Ava") and Defendant Rodney Cogburn ("Rodney") owned the entire unified parcel of land. [*Id.*] In fact, Defendants Ava and Rodney owned 19.1 acres of the land, non-parties Ben Walcher and Sheree Cogburn owned six acres of the land, and Defendant Rodney and his son each had a 50% interest in the remaining five acres of the land. [*Id.* at ¶ 22]

[1] For context, the facts in this Section are drawn from the allegations in Plaintiff's Third Amended Complaint (the "Complaint"). [#99]

Later, Defendants Ava and Rodney informed Plaintiffs that the land was generational and that Defendant Rodney was a fifth-generation farmer there. [*Id.* at ¶ 21] Defendants Ava and Rodney also informed Plaintiffs that the Cogburn family was well known and loved within the community, the family was a member of the local church, the family was close with the individuals working on the land, and that the family had industrial hemp growing experience. [*Id.*]

Plaintiffs paid approximately $800,000 related to the joint venture. [*Id.* at ¶ 31] These funds were commingled with Defendants funds. [*Id.* at ¶ 101] Plaintiff Barak told Defendants that Plaintiffs would not fund more than $200,000 for labor costs of the joint venture. [*Id.* at ¶ 33] From July 15, 2019, to approximately October 20, 2019, at least 33,000 joint venture hemp clones and/or mid-size hemp plants were planted, cultivated, harvested into biomass and smokeable flower, and stored on the farm property. [*Id.* at ¶ 34] The storage property included the property owned and belonging to the Walchers, which had a separate and independent Colorado Department of Agriculture Industrial Hemp license from that of the property owned by Defendants Rodney and Ava. [*Id.*] Plaintiffs estimate that the 33,000 hemp clones and plants could have been sold for a market value of a minimum of $19.8 million to a maximum of $52.8 million. [*Id.* at ¶ 36] Plaintiffs maintained a 50% interest in the joint venture. [*Id.* at ¶ 37]

Defendants harvested all the hemp biomass and smokable flower by October 23, 2019. [*Id.* at ¶ 47] Plaintiff Barak agreed with Defendant Rodney to have 250 pounds of the joint venture's biomass transported to an extraction facility. [*Id.* at ¶ 52] Defendants had not filed any report of the relevant 250-pound harvest with the Colorado Department of Agriculture and had not accounted for crop harvested and cured on the property as to

the final weight, value, fitness for purpose, fitness of quality, measurements of strains or genetics, sales, transfers, exchanges, or whereabouts. [*Id.* at ¶ 55] Later, the 250 pounds of the hemp biomass was delivered to the extraction facility. [*Id.* at ¶ 56] Upon learning of this delivery, Defendants Ava and Rodney contacted Plaintiff Barak and demanded that he purchase an extraction machine so that the extraction from hemp biomass into CBD oil could be performed on the farm. [*Id.* at ¶ 57] Plaintiff Barak refused to pay for the extraction machine and then Defendant Ava began "screaming" at Plaintiff Barak that the hemp delivered to the extraction facility had been stolen and she would be reporting the theft to the police. [*Id.* at ¶ 58]

On or about October 20, 2019, Defendants advised Plaintiff Barak that they were no longer welcome on the farm and that if they returned to the farm, they "would be shot." [*Id.* at ¶ 59] Defendants took possession of approximately 65,750 pounds of the joint ventures' biomass and smokeable flower. [*Id.*] Plaintiffs then made demands upon Defendants for possession of 50% of this product which Defendants refused. [*Id.* at ¶¶ 60, 67] On October 29, 2019, Defendants Ava and Rodney contacted the Mesa County Sheriff's Department and submitted a report alleging that 13,000 pounds of harvested and stored hemp biomass and smokable flower was stolen, including the 250 pounds of hemp biomass that was delivered to the extraction facility. [*Id.* at ¶ 62] Approximately 52,000 pounds of hemp biomass and smokable flower disappeared from the property between October 20 and 29, 2019. [*Id.* at ¶ 63] Defendants claimed that only snippets of surveillance of the property during that period were available. [*Id.*]

On November 6, 2020, the Mesa County Sheriff's Department took two containers containing approximately 14.4 pounds and 1.31 pounds of CBD oil extracted from the 250

pounds of joint venture hemp into custody from the extraction facility. [*Id.* at ¶ 66] At the time of the Sherriff's Department investigation, Defendants still had 781 pounds of smokable flower and 1,740 pounds of hemp biomass in their possession. [*Id.* at ¶ 68]

Plaintiffs' pending claims against Defendants include: (1) conversion against all remaining Defendants [*id.* at ¶¶ 46-70], (2) civil theft against all remaining Defendants [*id.* at ¶¶ 71-97], and (3) unjust enrichment against Defendant Rodney and Ava [*id.* at ¶¶ 98-105].

## II. FACTUAL BACKGROUND RELATED TO THE COUNTERCLAIMS[2]

Defendants Ava and Rodney run a family farm and wild game guide company, which is Defendant Rooster. [#161 at ¶ 10] In the summer of 2019, Plaintiffs approached Defendants about a joint venture to grow and sell hemp on Defendants' land. [*Id.* at ¶ 11] On July 5, 2019, Plaintiffs provided a letter of intent laying out their proposal whereby Plaintiffs would invest $1 million into Defendant Rooster and provide all the clones or starter plants for the operation. [*Id.* at ¶ 12] Under the proposal, Defendants would provide the land and some of the labor for the operation. [*Id.*] At that time, the parties intended to split the profits 51% for Defendant Rooster and 49% for Plaintiffs after expenses were paid. [*Id.*] The proposed contract maintained this profit split and outlined specific expenses that Plaintiff Barak was required to pay, including for certain security equipment, irrigation system upgrades, labor, electricity, accounting, plants, and machine operation. [*Id.* at ¶ 14] The required payments totaled a minimum of $588,000. [*Id.*] Plaintiff Barak also orally stated that he had pre-arranged buyers for the hemp once it

---

[2] For context, the facts in this Section are drawn from the allegations in Defendant's Second Amended Counterclaims (the "Counterclaims"). [#161 at 14-23]

was grown. [*Id.* at ¶ 15] Plaintiff Barak stated that the project would produce $30 million in revenue. [*Id.*]

Following the agreement, Defendants provided land and the agreed upon portion of labor. [*Id.* at ¶ 16] Plaintiffs provided money and clones and sent their agents to the property to help manage the venture. [*Id.*] On September 24, 2019, the parties executed an updated joint venture contract. [*Id.* at ¶17]

During the term of the joint venture, Plaintiffs wired Defendants approximately $193,000. [*Id.* at ¶ 18] This amount was insufficient to fund the joint venture. [*Id.*] Defendants continued to perform through the harvest period in October 2019. [*Id.* at ¶ 20] In total, Defendants spent over $87,000 on expenses. [*Id.*] For example, Defendants paid some of the workers hired to work the hemp field out of their own funds. [*Id.* at ¶ 21] Defendants also paid for consulting services, farming equipment, and other farming supplies. [*Id.* at ¶ 22] Though Plaintiffs provided clones to grow the hemp plants, the level of THC was found to be above the legal limit in Colorado. [*Id.* at ¶ 23] The clones were also infested with mites when they arrived at the farm. [*Id.*] The hemp clones provided by Plaintiffs produced hemp with 2.2% CBD content, far below the promised ten percent. [*Id.* at ¶ 24]

In some cases, hemp plants can be harvested early to prevent them from testing above the legal THC level. [*Id.* at ¶ 25] Defendants suggested harvesting early, but Plaintiff Barak insisted that they delay harvest. [*Id.*] When the hemp was harvested, it was tested and found to have THC above the allowable level and low CBD levels. [*Id.* at ¶ 26] This made the hemp subject to destruction per the permit requirements obtained by Defendants. [*Id.*]

Throughout the duration of the joint venture, Plaintiffs' agent misrepresented himself as an agent or owner of Rooster when signing a security contract and removed more than 20,000 pounds of harvested hemp without authority. [*Id.* at ¶ 27] Defendants filed two police reports with the Mesa County Sheriff regarding theft of the hemp harvest. [*Id.* at ¶ 29] The first was concerning the 250 pounds of hemp biomass and the second concerned 20,000 pounds of hemp biomass. [*Id.*]

Defendants stored 2,521 pounds of harvested hemp which exceeded allowable THC concentrations. [*Id.* at ¶ 30] As a result, at the direction of the Colorado Department of Agriculture, the product was destroyed. [*Id.*] Defendants spent at least $25,000 to get the property back in order after their engagement with Plaintiffs. [*Id.* at ¶ 31]

Defendants' pending counterclaims against Plaintiffs include: (1) breach of contract [*id.* at ¶¶ 32-35], (2) fraud in the inducement and misrepresentation [*id.* at ¶¶ 36-43], and (3) civil theft [*id.* at ¶¶ 44-48]. All three counterclaims have been filed against all Plaintiffs. [*Id.* at ¶¶ 32-48]

## III. PROCEDURAL BACKGROUND

This case has a long and complicated procedural history which the Court briefly outlines here. The case was originally filed on December 16, 2019. [#1] Plaintiffs filed the currently operative Complaint on May 7, 2021. [#99] Defendants filed their operative Answer to the Complaint, after several of their own amendments, on April 7, 2022. [#161] Throughout the first few years of this case, Defendants sought and received numerous extensions of time to file. [*See*, *e.g.*, ##47, 49, 61, 63, 176, 178, 205, 206, 211, 212] Defendants also had counsel withdraw and retained new counsel multiple times. [*See*,

*e.g.*, ##85, 93, 133, 137] Plaintiffs sought and received some extensions too. [*See*, *e.g.*, ##40, 42, 74, 106] Discovery closed in September 2022. [#178]

On July 26, 2024, the case was set for an eight-day jury trial which was supposed to commence on April 21, 2025. [#244] On March 3, 2025, Plaintiffs sought to continue the trial because Plaintiff Barak contracted Dengue fever while in Costa Rica. [*See* #246] The Motion to continue was granted. [#256] The eight-day jury trial was reset for November 2026. [#263] In January 2026, one of Plaintiffs' attorneys filed a Motion to Withdraw. [#264] This Motion was granted. [#266] Plaintiffs' remaining counsel filed a Motion to Withdraw shortly thereafter. [#267] A hearing was set on this Motion to Withdraw, which Plaintiffs and their representatives were ordered to attend. [#272] Neither Plaintiff Barak nor any LLC representative attended the hearing. [#273] Nevertheless, the Motion to Withdraw was ultimately granted on February 25, 2026, leaving Plaintiff Barak pro se and leaving the LLC Plaintiffs unrepresented. [*Id.*] The LLC Plaintiffs were ordered to obtain counsel within 30 days of February 25, 2026. [*Id.*]

The Court held a status conference on April 22, 2026, at which Plaintiffs and their representatives again failed to appear. [#275] On May 15, 2026, Defendants filed the instant Motion.[3] [#281] On June 16, 2026, Plaintiff Barak filed a Motion for extension of time to comply with court orders and to continue trial deadlines once again. [#290] Plaintiff Barak explained that he had emergency oral surgery in April 2026 following "a severe traumatic maxillofacial injury" and had a second surgery on May 19, 2026. [*Id.* at 2] Apparently, the maxillofacial injury was sustained in January 2025, after which time

[3] Plaintiff Barak filed a Response [#283], Defendants filed a Reply [#284], and Plaintiff Barak filed a sur-reply [#298]. The LLC Plaintiffs are unrepresented by counsel and thus have not filed any response.

Plaintiff Barak began receiving treatment, and he had multiple surgical procedures done throughout 2025. [*Id.*] This motion for extension of time was ultimately denied for reasons stated on the record, including that: (1) Plaintiff Barak was unable to explain his continuing inability to seek counsel for the LLC Plaintiffs and (2) there was no reason to believe a 90-day extension would relieve Plaintiff Barak of his present medical issues such that he could begin preparing for trial pro se. [#301]

On July 28, 2026, the Court issued an order requiring that the LLC Plaintiffs file a status report updating the Court as to whether they had retained counsel by August 18, 2026. [#302] The Court order indicated that failure to retain counsel may result in a recommendation of dismissal of the LLC Plaintiffs' affirmative claims and may result in default judgment being entered against the LLC Plaintiffs on the defensive claims. [*Id.*] On August 18, 2026, counsel entered on behalf of the LLC Plaintiffs for the sole purpose of seeking an extension of time to retain counsel. [#308] The Court granted an extension of time until September 2, 2026, for the LLC Plaintiffs to retain general counsel. [#310] To date, now over a week since the September 2 deadline passed, no attorney has entered appearance for general representation on behalf of the LLC Plaintiffs.

## IV. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 41(b)

Federal Rule of Civil Procedure 41(b) provides: "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." In considering dismissal under Rule 41(b), courts in the Tenth Circuit have considered the following five factors, initially set forth in *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992): (1) the degree of actual prejudice to the

defendant, (2) the amount of interference with the judicial process, (3) the culpability of the litigant, (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance, and (5) the efficacy of lesser sanctions. *See Quarrie v. N.M. Inst. of Mining & Tech.*, 621 F. App'x 928, 931 (10th Cir. 2015).

**B. Federal Rule of Civil Procedure 37**

Pursuant to Federal Rule of Civil Procedure 37, a court may impose sanctions on a non-compliant litigant for failure to obey court orders, failure to make certain disclosures, or for evasive disclosures. Courts can impose a broad range of sanctions under Rule 37, including striking pleadings, dismissing the action, rendering a default judgment, treating the disobedience as contempt of court, and ordering payment of reasonable expenses and attorneys' fees. Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii), (2)(C). Moreover, pursuant to Federal Rule of Civil Procedure 16, if a party "fails to obey a scheduling or other pretrial order," a court "may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)–(vii)." Fed. R. Civ. P. 16(f)(1)(C). "Additionally, courts 'have broad inherent power to sanction misconduct and abuse of the judicial process,' including the power to enter default judgment. *AMG Nat'l Corp. v. Wright*, No. 20-cv-02857-PAB-KAS, 2024 WL 1299100, at *2 (D. Colo. Feb. 13, 2024) (quoting *Klein v. Harper*, 777 F.3d 1144, 1147 (10th Cir. 2015)), *report and recommendation adopted*, 2024 WL 1436292 (D. Colo. Mar. 4, 2024).

"Default judgment is 'a harsh sanction that should be used only' if the failure to comply with court orders is the result of 'willfulness, bad faith, or any fault of the disobedient party' rather than inability to comply." *Klein*, 777 F.3d at 1147–48 (quoting *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1159 (10th Cir. 2013)). "This Circuit

has defined a willful failure as 'any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown.'" *AMG Nat'l Corp.*, 2024 WL 1299100, at *2 (quoting *Patterson v. C.I.T. Corp.*, 352 F.2d 333, 336 (10th Cir. 1965)). "Before entering default judgment as a sanction, the Court must consider (1) 'the degree of actual prejudice to the [opposing party],' (2) 'the amount of interference with the judicial process,' (3) 'the culpability of the litigant,' (4) 'whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance,' and (5) 'the efficacy of lesser sanctions.'" *Id.* (quoting *Ehrenhaus*, 965 F.2d at 921).

### C. Pro Se Litigants

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). "The *Haines* rule applies to all proceedings involving a pro se litigant." *Id.* at 1110 n.3. The Court, however, cannot be a pro se litigant's advocate. *See Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008). Moreover, pro se parties must "follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (quoting *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992)).

## V. ANALYSIS

### A. Dismissal

#### 1. LLC Plaintiffs

Defendants first argue that the two LLC Plaintiffs must be dismissed from this action with prejudice for failure to obtain counsel. [#281 at 7-8] An LLC "may not appear without counsel admitted to the bar of this court." D.C.COLO.LAttyR 5(b); *see also*

*Harrison v. Wahatoyas, L.L.C.*, 253 F.3d 552, 556 (10th Cir. 2001) ("a corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing pro se."). Here, counsel for the LLC Plaintiffs withdrew on February 25, 2026, over six months ago. [#273] The LLC Plaintiffs failed to have a representative attend the hearing on the Motion to Withdraw, despite being explicitly directed to do so. [#272] When the Motion to Withdraw was granted, the LLC Plaintiffs were informed they could not appear without counsel. [#273] Additionally, the LLC Plaintiffs were informed that failure to obtain counsel by March 27, 2026, could result in a recommendation that the LLC's case be dismissed. [*Id.*] The LLC Plaintiffs did not obtain counsel by this date. Instead, they again failed to attend a court hearing on April 22, 2026. [#275] On July 28, 2026, the LLC Plaintiffs were once again ordered to file a status report as to whether they had retained counsel and were again warned that failure to retain counsel could result in its affirmative claims being dismissed. [#302] The LLC Plaintiffs were granted an extension to make this filing, yet they failed to meet the deadline and have not retained general counsel to date. [#310] It has now been three months since the instant Motion was filed, and the LLC Plaintiffs have neither responded nor obtained counsel.

Under the Federal Rules of Civil Procedure, when a "plaintiff fails to prosecute or to comply with . . . a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). Additionally, the Court is permitted to "issue any just orders, including [dismissing the action or rendering a default judgment], if a party or its attorney . . . fails to obey a . . . pretrial order." Fed. R. Civ. P. 16(f)(1). Therefore, the Court has authority to dismiss the LLC Plaintiff's claims. However, before dismissing an

action or imposing a default judgment, the Court must consider certain factors enumerated in *Ehrenhaus*, 965 F.2d at 921.

The first factor requires the Court to assess the degree of actual prejudice to the Defendants. Defendants have spent time and resources litigating this action for the past six months. Defendants attended at least one hearing at which the LLC Plaintiffs failed to attend. Defendants have filed the instant Motion, to which the LLC Plaintiffs failed to respond. This case is set for trial in November 2026, which at this point is two months away. This case has been ongoing for nearly seven years. Therefore, the LLC Plaintiffs' conduct has prejudiced the Defendants.

The second factor requires the court to assess the amount the LLC Plaintiffs have interfered with the judicial process. Considering the LLC Plaintiffs have failed to prosecute this case for over six months, the LLC Plaintiffs' conduct "interferes with the effective administration of justice." *Alirez v. Univ. of N. Colo.*, No. 23-cv-00169-GPG-NRN, 2023 WL 11862132, at *2 (D. Colo. May 5, 2023), *report and recommendation adopted*, 2023 WL 11862134 (D. Colo. June 21, 2023). And "[the LLC Plaintiffs'] actions increase the workload of the Court and take its attention away from other matters where the parties have fulfilled their obligations and are deserving of prompt resolution of their issues." *Id.* (quoting *Peters v. Bank of Am.*, No. 10-cv-01382-WJM-MJW, 2011 WL 1045297, at *3 (D. Colo. Mar. 21, 2011)).

The third factor requires the Court to assess the culpability of the litigants. The LLC Plaintiffs were warned both by the Court and by their prior counsel, over six months ago, that they could not proceed in this action without counsel. [##267 at ¶ 4; 273] The LLC Plaintiffs were required to obtain counsel by March 27, 2026, but failed to do so and

failed to provide any explanation to the Court for this failure. Representatives of the LLC Plaintiffs were required to attend two Court hearings and failed to do so. [##273; 275] To date, the Court has not been given any satisfactory explanation as to why the LLC Plaintiffs have failed to obtain counsel. Though Plaintiff Barak argues that he has been prevented from obtaining counsel for the LLC Plaintiffs due to his recent surgeries, the first of his emergency surgeries occurred in April 2026. The LLC Plaintiffs were required to obtain counsel well before this date. Additionally, Plaintiff Barak has been capable of writing, doing research pertaining to, and filing many documents with the Court since his alleged emergency surgery. [*See*, *e.g.*, ##277; 283; 285; 286; 295; 298; 300; 305] Thus, it is unclear why Plaintiff Barak has been unable to seek counsel for the LLC Plaintiffs. And the Tenth Circuit has found that "a party's 'inability to secure a lawyer' can sometimes be that party's own fault." *Derma Pen, LLC v. 4EverYoungLimited*, 736 F. App'x 741, 746 (10th Cir. 2018) (citing *Jones v. Thompson*, 996 F.2d 261, 265 (10th Cir. 1993)). As a result, the Court finds that the LLC Plaintiffs are culpable for their failure to prosecute.

The fourth factor requires the Court to assess whether the Court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance. The Court explicitly warned the LLC Plaintiffs that "[f]ailure to obtain counsel [by March 27,2026] . . . will result in a recommendation that the LLCs case be dismissed." [#273] Several weeks ago, the Court again warned the LLC Plaintiffs that failure to file a status report and retain counsel "may result in a recommendation of dismissal of the LLC Plaintiffs' affirmative claims and may result in a default judgment being entered against them on the defensive claims." [#302] The Court did not specify whether such dismissal would be with or without prejudice.

The fifth factor requires the Court to assess the efficacy of lesser sanctions. The Court has given the LLC Plaintiffs over six months to obtain counsel. The Court has not been given any satisfactory reason for their failure to do so. Additionally, the Court has not been given any indication that the LLC Plaintiffs will obtain counsel at any time in the near future. A trial date has been set and is only two months away. The Court's multiple prior orders have not produced compliance by the LLC Plaintiffs. Accordingly, no sanction less than dismissal will be effective.

Thus, the five *Ehrenhaus* factors weigh in favor of dismissing the LLC Plaintiffs' claims. Nonetheless, the Court recommends that dismissal be without prejudice. Dismissal with prejudice "is a harsh remedy and is 'the death penalty of pleading punishments.'" *Egbune v. Baum*, No. 1:23-cv-02830-PAB-SBP, 2025 WL 438705, at *3 (D. Colo. Jan. 22, 2025) (quoting *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1162 (10th Cir. 2007)). Prior to their counsel withdrawing six years into this case, the LLC Plaintiffs complied with all Court orders and did not miss any Court appearances. While the LLC Plaintiffs did seek a continuance of the trial that was originally set for April 2025, the presiding Judge found good cause to grant this continuance. [#256] Accordingly, this fact is not counted against the LLC Plaintiffs. Additionally, as the Court previously recounted, Defendants themselves have sought numerous extensions of deadlines throughout the many years of this case. Thus, Defendants cannot blame Plaintiffs alone for the lengthy duration of this case. Dismissal with prejudice is a "last-resort sanction" that the Court is not prepared to issue here. *See United States v. 2018 Mercedes-Benz GLE*, No. 1:23-cv-00842-RMR-SBP, 2025 WL 2093228, at *4 (D. Colo. Apr. 21, 2025), *report and recommendation adopted*, 2025 WL 2093213 (D. Colo. May 6,

2025). Indeed, other courts in this District have been hesitant to sanction a party by dismissal with prejudice in circumstances like those here in which a plaintiff has failed to appear at court hearings, failed to comply with court orders and rules, and otherwise failed to prosecute an action. *See*, *e.g.*, *Coad v. Waters*, No. 11-cv-01564-PAB-CBS, 2013 WL 1767788, at *3 (D. Colo. Apr. 5, 2013), *report and recommendation adopted*, 2013 WL 1767786 (D. Colo. Apr. 24, 2013). The Court therefore concludes that dismissal without prejudice will be an effective sanction here. As a result, the Court respectfully RECOMMENDS that the claims asserted by Plaintiffs KR8TIV, LLC and KR8TIV Group, LLC be DISMISSED WITHOUT PREJUDICE.

**2. Plaintiff Barak**

Defendants also argue that Plaintiff Barak's claims should be dismissed for disobedience of court orders and for failure to prosecute. [#281 at 8] The Court disagrees. Though Mr. Barak failed to attend two hearings at which he was required to appear [##273, 275], Mr. Barak has since continued to litigate these claims. Mr. Barak responded to the instant Motion [#283] and appeared telephonically at an unrelated hearing [#301]. It appears from his filings and appearances that Mr. Barak is committed to continuing to litigate his claims pro se. A trial preparation conference is presently set for November 13, 2026, and trial is set for November 20, 2026. [#263] While Mr. Barak sought an extension of these deadlines [#290], his motion was denied [#301]. Accordingly, the trial is still set to occur in two months. Thus, it does not appear that dismissal of Mr. Barak's claims is appropriate at this stage.

Neither do the *Ehrenhaus* factors suggest otherwise. The first hearing that Mr. Barak failed to appear at was a hearing on the Motion to Withdraw filed by Mr. Barak's

own counsel. [#273] Defendants did not object to the Motion to Withdraw. [#267 at ¶ 6] Plaintiffs' former counsel did attend the hearing; therefore, Defendants suffered minimal if any prejudice as a result of Mr. Barak's failure to appear at the hearing. The second hearing Mr. Barak failed to appear at was a status conference. [#275] While Defendants certainly suffered some prejudice for Plaintiffs' failure to appear at this hearing, this level of prejudice alone does not warrant the extreme sanction of dismissal of Mr. Barak's claims.

While Mr. Barak interfered with the judicial process when he failed to appear as ordered on two occasions, this amount of interference does not rise to the level warranting dismissal. It appears that Mr. Barak is now aware of the gravity of his duties to the Court and the possible negative ramifications for failing to comply with court orders. Accordingly, Plaintiff Barak has participated in hearings and made appropriate court filings over the past several months. While Plaintiff Barak is certainly culpable for his own missed appearances, two missed appearances over the course of almost seven years is again insufficient to warrant such a harsh sanction.

Plaintiff Barak was warned that his failure to appear that the April 22, 2026 status conference could "result in a recommendation of the dismissal of his affirmative claims for failure to prosecute and may result in judgment against him on the defensive claims." [#273] But this warning does not outweigh the other factors disfavoring dismissal in these circumstances. The Court thus finds that this harsh sanction is not warranted to compel compliance under the circumstances. The Court thus respectfully RECOMMENDS that the Motion be DENIED to the extent that it seeks an order dismissing all claims filed by Plaintiff Barak.

### B. Default Judgment

Defendants argue that the Court should enter default judgment in favor of all of Defendants' counterclaims. [#281 at 12-17]

#### 1. Plaintiff Barak

As previously described, the Court must consider the *Ehrenhaus* factors before imposing default judgment as a sanction against a non-compliant party. And the Court has already assessed these factors with respect to Defendants' request for dismissal of Mr. Barak's claims. The Court's analysis does not change here. Default judgment is a harsh sanction that the Court is unwilling to impose at this juncture. Though Mr. Barak did miss two hearings at which his attendance was mandatory, Mr. Barak has since participated in all hearings, responded to all filings, and continued to litigate in Court. Considering that "[d]efault judgment is an extreme sanction that should be used as a last resort", *David v. Wasatch Cnty.*, 2:24-cv-00215, 2026 WL 788670, at *8 (D. Utah Mar. 20, 2026), the Court does not find that default judgment is appropriate at this time. Accordingly, the Court respectfully RECOMMENDS that the Motion be DENIED to the extent it seeks a default judgment against Mr. Barak.

#### 2. LLC Plaintiffs

"Where a corporation or other business entity fails to retain counsel, the court may enter default judgment against that entity." *Francis v. HGLK Inc. Woody's Lawn Sprinkler & Landscape*, No. 22-cv-01717-RM-KAS, 2024 WL 6475165, at *1 (D. Colo. Apr. 4, 2024) (quoting *Digital Ally, Inc. v. Culp McAuley, Inc.*, No. 22-2203-HLT-ADM, 2022 WL 20056016, at *1 (D. Kan. Dec. 5, 2022)), *report and recommendation adopted*, 2024 WL 6475166 (D. Colo. Apr. 25, 2024)). However, "when one of several defendants who is

alleged to be jointly liable defaults, judgment should not be entered against him until the matter has been adjudicated with regard to all defendants, or all defendants have defaulted." *Gen. Steel Domestic Sales, LLC v. Chumley*, 306 F.R.D. 666, 670 (D Colo. 2014) (quoting *Hunt v. Inter-Globe Energy, Inc.*, 770 F.2d 145, 147 (10th Cir. 1985)). "The purpose of this rule is the avoidance of the problem of inconsistent liability determinations among joint defendants." *Id.* at 671 (quotation omitted).

Here, Defendants assert three Counterclaims against all Plaintiffs. [#161 at 14-23] None of the claims indicate that the acts committed by or damages caused by the LLC Plaintiffs are separate from those of Mr. Barak. The Court thus cannot enter default judgment against the LLC Plaintiffs, as it would risk inconsistent liability determinations. The Court therefore respectfully RECOMMENDS that the Motion be DENIED to the extent that it seeks default judgment against the LLC Plaintiffs.

## IV. CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendants' Combined Motion to Dismiss and Motion for Default and Default Judgment [#281] be **GRANTED** in part and **DENIED** in part. Specifically the Court **RECOMMENDS** that: (1) the Motion be **GRANTED** to the extent it seeks to dismiss the claims brought by Plaintiffs KR8TIV, LLC and KR8TIV Group, LLC and that those claims be **DISMISSED WITHOUT PREJUDICE** and (2) the Motion otherwise be **DENIED**.[4]

[4] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and

DATED: September 10, 2026

BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge

---

recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review." *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refin. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).